(No. 13351.—Reversed and remanded.)
The City of Elmhurst, Appellee, vs. Frederick H. Rohmeyer, Appellant.

*Opinion filed April 21, 1921.*

1. Special assessments—*when construction of sewer system is not a double improvement.* The construction of sewers which drain more than one watershed in a city but which are connected with each other by means of a disposal plant and carry sewage and storm water at the same time constitutes but one system of improvement, as a city has the right by one ordinance to provide for a connected system of sewers in and along its streets whereby they may be improved.

2. Same—*construction of disposal plant to aid proposed sewer system does not constitute a double improvement.* The construction of a secondary improvement to aid the purpose of the main improvement in contemplation does not render the improvement double, and hence a sewer for drainage purposes may be constructed in connection with a sidewalk improvement, pumping works be erected in connection with a sewerage system, or a disposal plant built in order that a proposed sewer system may accomplish its proper purpose.

3. Same—*when construction of sewage disposal plant should be regarded as a local improvement.* The construction of a sewage disposal plant which is necessary to prevent the pollution of the water of the creek into which a proposed sewer system will drain should be regarded as a local improvement to be paid for by special assessment, where a similar system of sewers in another part of the city connected with another disposal plant has been constructed and paid for by special assessment of the property benefited in that locality.

4. Same—*what determines whether improvement is local.* The test whether or not an improvement is local depends upon the question whether or not it specially benefits property specially assessed; and an improvement may be local though it benefits the public generally, provided it also specially benefits the property assessed.

5. Same—*when witnesses are not competent to testify as to benefits.* Expert non-resident witnesses having no personal knowledge of the facts are not competent to testify as to the amount of benefit unsubdivided property will receive from the construction of a sewer system, where one of the sharply contested questions is whether the property is ready for subdivision and where said witnesses base their opinions solely on information they receive from parties who reside in the city.

6. SAME—*witness giving opinion as to benefits must testify of his own knowledge.* . No witness, whether lay or expert, can give his opinion as to the value of property or whether it will be damaged or benefited by a certain improvement where he has no personal knowledge of the facts, as it is not permissible, on such issues, to allow opinions to be given based upon hypothetical questions or the statements of other persons.

7. SAME—*witness must show qualifications before giving opinion that property is ready for subdivision.* A witness should show his qualifications before being allowed to give his opinion that farm land is ripe for subdivision.

APPEAL from the County Court of DuPage county; the Hon. S. L. RATHJE, Judge, presiding.

ERNEST C. LUTHER, for appellant.

ALBEN F. BATES, City Attorney, and B. F. LANGWORTHY, for appellee.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

The city of Elmhurst, appellee, filed its petition in the county court of DuPage county asking the court to confirm a special assessment to pay the cost of constructing a system of sewers for the southwest portion of the city. Appellant, Frederick H. Rohmeyer, filed certain legal objections, which were overruled by the court. He also filed certain other objections to the assessment roll, among which were the objections that his property was assessed more than it was benefited and that it was assessed more than its proportionate share of the cost of the improvement. There was a jury trial upon these latter objections and the jury found against this contention. The court entered an order confirming the assessment against appellant's property after reducing it from $10,796.79 to $8796.79.

The city of Elmhurst has about four square miles of territory, with a small extension added to the southwest. It is approximately two miles north and south and the same distance east and west, with the exception of about a quarter of a mile. The corporate limits are marked by an ir-

regular line. In the property within the corporate limits that is platted into additions of the city there are approximately 1020 improved lots and about 3400 unimproved or vacant lots. Outside of the platted additions and within the corporate limits there is a great deal of farm land, comprising perhaps more than a third of all the territory. A great deal of this farm land is situated in the southwest part of the city. Rohmeyer's property is situated in the southwest part and is all farm land. His farm is approximately square, containing 35.32 acres, and is crossed diagonally by the Illinois Central railroad, running northwest and southeast, cutting off a considerable portion of the northeast part of it. At the north line the railroad track is on a dump seven or eight feet higher than the surrounding land, and following this dump in a southeasterly direction its elevation gradually decreases until it is about three and one-half feet in height where it leaves the land. There is a private roadway crossing over the track. The Chicago Great Western railroad runs about 150 feet south of the farm, in an easterly and westerly direction. Appellant has owned and farmed this land for forty-nine years, and it is improved with a six-room farm cottage, a barn, tool house, corn-crib, hog house and chicken house. All of the land is used for farming and has not been affected by excessive water. The streets on the south and west are half-streets, 30 and 25 feet in width, respectively. To the west and south of his farm is Young's Fourth Spring Road addition, laid out in 1907, containing twelve blocks and eighty-four or eighty-five lots. Only twenty of these lots are improved. Immediately west of his farm there are four houses,—one built about a year and a half or two years ago and the other three within eight or ten months before the trial. On the north and east sides of this farm are the St. Charles and Spring public roads, 66 and 60 feet wide, respectively. Immediately north of appellant's land there are 23 acres of farm land belonging to Mrs. Lathrop, and west of her land about a half

mile, to the corporation limits, and northwest of her land, the land is all farm land.  On the property east of appellant, which is used mostly for farming, there are two residences.  South of appellant's farm, to the corporation line, there are two 40-acre tracts of land.  The first 40 acres south is subdivided into lots.  South and southwest of his land, within the corporation limits, there are more than 160 acres of land, about 120 of which are subdivided into lots, and in all of this last named territory there are fifty-six houses, counting the farm house.

The improvement in question consists, first, of a system of sewers covering a territory in the south or southwest portion of the city three-quarters of a mile north and south and one and one-half miles east and west, and is intended to serve a territory one and one-quarter miles north and south and one and one-half miles east and west.  Throughout the entire district the drainage of the land is to the south, and it naturally and ultimately drains into Salt creek, which is on the western boundary of the district.  The main sewer line begins at the southwest corner of the corporate limits, at Salt creek, and runs straight east for a mile or more.  This main line sewer varies from sixty-six inches in diameter internal measurement on the west to fifty-four inches on the east.  It is connected with various sewers running from it northward across the district.  Connected with these lines of sewers running northward are also various cross-sewers running east and west, the water and various matter collected therein flowing by gravity.  They constitute one complete, connected system of sewers and drain the entire district, except a portion north of the Chicago Great Western railroad right of way and west of a line north and south about midway across appellant's land.  This portion of the district contains about 80 acres, and sewers are provided in this portion extending down West avenue (or Quarry road) to the north line of the railroad right of way, at which point the sewage is diverted to the

east and the storm water into Salt creek. The sewage is diverted into a twelve-inch sewer east one block, then across the railroad right of. way and down Rex boulevard. This sewer in Rex boulevard south of the railroad right of way serves the lots on either side of the boulevard. The storm water from Rex boulevard south of the railroad right of way empties directly into Salt creek, and the sewage passes into an intercepting sewer which is laid from the main sewer near Salt creek north and northwest to the disposal plant. The disposal plant consists substantially of a pump-pit and pump, concrete grit chamber, concrete settling tank, sludge beds and filter beds. It is constructed to prevent the sewage from getting into Salt creek and creating a public nuisance by polluting the water in the creek. The sewage passes by gravity into the disposal plant for the purpose of rendering it innocuous before it passes into Salt creek, thus preserving the public health. The disposal plant is connected with every sanitary sewer in the system, and it and the sewerage system are to be constructed as one entire improvement. The construction of the disposal plant as part of this sewerage system was considered necessary by the city under paragraph 60 of chapter 19, (Hurd's Stat. 1917, p. 165,) which provides, in substance, that the Rivers and Lakes Commission shall see to it that the streams in the State are not polluted or defiled by deposits or additions of any injurious substance, and that the same are not affected injuriously by the discharging therein of any foul or injurious substances, so that fish or other aquatic life may be, destroyed, and makes it the duty of such commission to make investigations and order the abatement of such nuisances within such time as may be fixed by it. This disposal plant is shown to be constructed of such capacity as will care for all the sewage that will be carried to it through the present system, as it is constructed so that further connections may be made to it by parties in the territory having the right to connect with the system by other

connecting sewers. The entire system is estimated to cost $271,818.21.

Appellee's motion to strike the bill of exceptions from the record because it was not presented, signed and filed within the time allowed by the trial court was overruled by this court June 3, 1920, on the following showing in the record: On December 9, 1919, the legal objections were overruled and the appellant given thirty days in which to tender and file a bill of exceptions. December 31, 1919, final judgment of confirmation was entered and appellant given sixty days to file a bill of exceptions consolidated with the legal objections and exceptions. February 9, 1920, the court granted an extension of thirty days to file the bill of exceptions. The time originally expired February 29, 1920, and the thirty days' extension gave appellant until March 30, 1920, to file the bill. It was presented, signed and filed March 10, 1920, within the time allowed. Appellee's contention cannot be further entertained.

The first legal objection argued by appellant is that the improvement is a double and not a single improvement. The improvement, as already shown, is a combined system of sewers, wherein both surface water and other sewage are carried. The entire system of sewer pipes is connected throughout, and the sanitary sewers collect the noxious sewage of the entire district and carry it to one and the same place for treatment,—the disposal plant,—before it is finally permitted to enter Salt creek. The disposal plant is a necessary part of the system because of the fact that the statute cited above forbids that noxious matter be flowed into Salt creek before it is treated and rendered harmless. It is unquestioned that the conclusion of the city that such treatment is necessary under the statute was warranted. The main ground for claiming that the improvement is double is the fact that the storm water passes into Salt creek at three different points,—one at the southwest corner of the corporation, another north of this point

at the south end of Rex boulevard, and the third at a point known as the Greatwestern outlet; that these storm water sewers drain three natural watersheds, and that drainage from these three watersheds is had at much greater cost by the use of the combined system. We do not think this contention should be sustained. As the sewers all carry sewage and storm water at the same time, and as all the sewers have connection with each other by means of the disposal plant, they constitute one system, and not two systems, for sewerage and drainage. It is not shown by the record that the cost to anyone would be less by having three different systems and three different disposal plants instead of a common system with one disposal plant. The natural inference would seem to be that a combined system would be at a less cost. A city or village has the right by one ordinance to provide for a connected system of sewers and drains in and along its streets and avenues whereby they may be improved, and such a system is not subject to the objection that it is a double improvement. (*Walker* v. *People,* 170 Ill. 410.) The construction of sidewalks on several streets may be provided for as one improvement if all property taxed therefor will receive some benefit from the proposed improvement. (*Storrs* v. *City of Chicago,* 208 Ill. 364.) The construction of another improvement to aid the purpose of the main improvement in contemplation will not render the improvement double for that reason, as in the case of the construction of a sewer for drainage purposes in a sidewalk improvement, or the establishment of pumping works in connection with a sewerage system in order that the latter may serve its proper purpose, or, as in the case now in hand, the construction of a disposal plant in order that the proposed system may accomplish its proper purpose. *City of Staunton* v. *Bond,* 281 Ill. 568; *Drexel* v. *Town of Lake,* 127 id. 54.

There are two principal reasons why we think the judgment of the county court should not be overruled in hold-

ing that the disposal plant is a local improvement and not a public improvement and should therefore be paid for by private assessment. In the first place, the city had previously constructed a similar system of sewers connected with a disposal plant in the northern and eastern parts of the city, and the property owners in that district paid for the disposal plant as a local improvement by special assessment. It would be very unjust to now call upon the property owners of the first district to contribute to the payment of this second disposal plant after having already paid for their own in their district. The disposal plant in question was necessary to prevent the pollution of the waters of Salt creek. It will also serve the purpose of preserving the health of the city by rendering the noxious matter harmless, and will relieve the city of the expense of lawsuits that might be occasioned by the pollution of the water in Salt creek. The test whether or not an improvement is local depends upon the question whether or not it specially benefits property that is specially assessed. (*Northwestern University* v. *Village of Wilmette*, 230 Ill. 80.) An improvement may be local though of some general benefit to the public, if it also specially benefits the property assessed. (*Loeffler* v. *City of Chicago*, 246 Ill. 43.) Constructing a reservoir, digging a well, erecting a stand-pipe and pumping works and building for the same, with a view of constructing waterworks in a city, when of general utility to its inhabitants, are regarded a public improvement to be paid for by general taxation; (*Ewart* v. *Village of Western Springs*, 180 Ill. 318;) but where structures are not of general utility to all the inhabitants of the municipality but are only used for the benefit of a small part thereof they are to be regarded as a local improvement. *Fisher* v. *City of Chicago*, 213 Ill. 268.

The court permitted, over the objection of the appellant, a number of witnesses from Chicago and other cities, who are referred to as expert witnesses, to express their

opinions to the jury as to how much appellant's property is benefited by the improvement in question, from information that they had gotten from parties in Elmhurst. Two of the latter parties were the mayor of the city and the city attorney, who were specially interested in the suit. Other witnesses, expert real estate men who had no special knowledge of their own concerning the property in question, were allowed to testify, from information received from local men, as to the value of appellant's property and as to how much it would be benefited by the improvement, and also that the best use for which the property could be used was for subdivision purposes for city and residence lots. These latter witnesses did not base their opinions on any knowledge they had as to whether or not the property was ready for subdivision. The admission of the foregoing testimony was very prejudicial to the appellant. One of the contested questions in the case was whether or not appellant's property was ripe for subdivision. This question depended upon many other questions upon which these so-called expert witnesses had no knowledge of their own. They did not know anything about how many lots there were in the city of Elmhurst that were unimproved and unsold or how many improved lots there were in the city. They had no knowledge of their own of the demand for city lots in the city of Elmhurst. No witness can give testimony in a case based upon information that he has received from outside parties who are not witnesses and who have not testified in the case, whether he is a lay witness or an expert witness. Such testimony is more objectionable coming from an expert witness than it would be coming from a lay witness. (2 Jones' Commentaries on Evidence, sec. 376.) Where the question is as to the value of a certain piece of real estate, or whether it will be damaged or benefited by a certain improvement, and how much, witnesses testifying upon those questions must do so from their own knowledge, and they must first qualify by showing that they have such

knowledge of the facts affecting those questions as will render their opinions valuable in determining the questions at issue.    It is not permissible to allow such witnesses to answer hypothetical questions bearing upon such matters or to give opinions based upon the testimony of other witnesses in the case, as expert witnesses may testify in other cases.    (*Geohegan* v. *Union Elevated Railroad Co.* 226 Ill. 482.)    It is therefore not proper for a witness to give his judgment as to the value of property or as to how much it will be benefited by an improvement, based upon a list of sales of property in the neighborhood and upon the supposition that the list represents true and correct sales. (*Chicago and Western Indiana Railroad Co.* v. *Heidenreich,* 254 Ill. 231.)    A witness must have actual, and not hearsay, knowledge as to sales, or of other questions affecting the value of property, in order to make his evidence competent in this class of cases.    (*O'Hare* v. *Chicago, Madison and Northern Railroad Co.* 139 Ill. 151.)    A witness should also show his qualifications before being allowed to give his opinion that farm land is ripe for subdivision. *City of Park Ridge* v. *Wisner,* 253 Ill. 434.

In view of the fact that there were so many vacant lots in the city of Elmhurst and so much farm land not subdivided into lots apparently nearer the center of the town and as suitable and desirable as appellant's, we consider it a very close question as to whether, in fact, appellant's property was ripe for subdivision.    We conclude from the evidence that if there was any demand for city lots located on appellant's farm, the weight of the evidence clearly shows that such demand was not great, and it would probably require a number of years before he could sell the lots if he had subdivided his land.    It was therefore very necessary that the jury consider only proper testimony upon that question. We think, also, that the contention of appellant is meritorious that the weight of the evidence fails to show that his property has been benefited by the improvement to the

amount of the judgment rendered by the court. In view of the fact that the case must be tried by another jury we do not think it proper to further discuss this question.

The judgment of the county court is reversed and the cause remanded.

*Reversed and remanded.*

---

(No. 13779.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Er-
ror, *vs.* MAX FENSKY, Plaintiff in Error.

*Opinion filed April 21, 1921.*