VELLA J. REESE, Individually and as Admrx. of the Estate of LOWELL ISAAC REESE, Deceased, Plaintiff-Appellee, *v.* CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY, Defendant (KOEHRING COMPANY, SCHIELD BANTAM DIVISION, Defendant-Appellant.)—(CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY, Counter-Plaintiff-Appellant, *v.* KOEHRING COMPANY, SCHIELD BANTAM DIVISION, Counter-Defendant-Appellee.)

(No. 71-95;

Second District—May 26, 1972.

Thomas, Kostantacos & Traum and Keegan & Gosdick, both of Rockford, and Theodore G. Schuster and Kralovec, Sweeney, Marguard & Scoby, both of Chicago, for appellant.

Roszkowski, Paddock & Johnson, of Rockford, for appellee.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Plaintiff, individually and as administratrix of the Estate of Lowell Reese, deceased, sued the Chicago, Burlington & Quincy Railroad and the Koehring Company, Schield Bantam Division, to recover damages for the death of Lowell Reese, who was killed while working for the Railroad as a bridge foreman, when he was struck by the bucket of a crane. The action against the Railroad was premised upon the Federal Employers Liability Act. The action against Koehring, as the manufacturer of the crane, was based upon a theory of strict liability.

The Railroad filed a counterclaim against Koehring seeking indemnity. We consider the appeals in both actions together.

On the eve of trial, plaintiff entered into an agreement with the Railroad under the terms of which the Railroad loaned plaintiff $57,500, without interest, which was repayable from any judgment plaintiff obtained against Koehring. The loan proceeds were not repayable if Koehring was found innocent of fault by the jury. On motion of the plaintiff, the action against the Railroad was dismissed without prejudice.

Trial of the action between plaintiff and Koehring proceeded. The jury found for the plaintiff in the sum of $149,000 and judgment was entered in that amount.

Jury was waived by the Railroad for the trial of the counterclaim against Koehring. The trial court held that the loan to the plaintiff by the Railroad constituted a covenant not to sue and that judgment against Koehring should be reduced by the amount of the loan. The court further held that the Railroad was not entitled to indemnity from Koehring.

I

We first consider the appeal of the primary suit by Koehring.

Prior to trial, the court struck that portion of Koehring's answer which alleged assumption of risk as an affirmative defense. Koehring argues that it was error to strike this pleading and that it should have been permitted to prove this defense under the circumstances of the case. It urges that the doctrine of assumption of risk, an available defense to a charge of strict liability, includes the element of misuse of the product even without proof that plaintiff had actual knowledge of the defect.

Plaintiff argues to the contrary and claims that a charge of "misuse" may be an issue only in connection with the proof of the dangerous condition and proof that the defect caused the injury. Plaintiff contends that the pleading did not allege facts sufficient to support the affirmative defense and was, therefore, properly stricken.

The affirmative defense was stated:

"* * * defendant alleges that plaintiff's intestate, Lowell Isaac Reese, contrary to the rules of the Chicago, Burlington & Quincy Railroad, and contrary to the safe operation of a crane, ordered and permitted the clamshell bucket to remain on the crane during hoisting operations; and further he stood with the clamshell bucket suspended over his head and thus was guilty of an assumption of risk."

■■ We conclude that the trial court correctly held that the allegations amounted to a pleading of contributory negligence, not available as a defense to a strict liability action, rather than a pleading of the defense of assumption of risk.

Both parties rely upon *Williams v. Brown Manufacturing Co.* (1970), 45 Ill.2d 418, but disagree as to its application. Koehring argues that the case holds that assumption of risk includes misuse of a product as a use which is for a purpose neither intended nor objectively reasonable. The opinion does hold that misuse of a product may bar a plaintiff's recovery. It does not hold that misuse is an aspect of the affirmative defense of assumption of risk. The court makes the distinction, at page 426, stating:

"There is likewise general agreement that a plaintiff who knows a product is in a dangerous condition and proceeds in disregard of this

known danger (often termed 'assumption of risk') may not recover for resulting injuries * * *." (Citations omitted.)

and on page 430:

"We emphasize that 'assumption of risk' is an affirmative defense which does bar recovery, and which may be asserted in a strict liability action notwithstanding the absence of any contractual relationship between the parties."

and further distinguishes the defense of "misuse" by stating on page 431:

"In addition, as earlier noted, plaintiff's misuse of the product may bar recovery. This issue may arise in connection with plaintiff's proof of an unreasonably dangerous condition or in proximate causation or both. See Annot. 13 A.L.R.3d 1057, Sec. 11 (1967)."

■■ Here the allegations contained in the pleading of the affirmative defense of assumption of risk did not meet the requirements of *Williams*. There was no statement that plaintiff knew that the product was defective and, therefore, dangerous (counsel conceding to the trial court that there would be no such proof); and there was no allegation that Reese proceeded in face of the known danger to his injury. The appellant is incorrect in arguing that misuse is a facet of the affirmative defense of assumption of risk.

■■ Defendant was entitled under *Williams* to show misuse of the product on the issue of causation. A review of the facts satisfies us that he was not precluded from doing so. In fact, he was permitted to explore matters which went beyond the issue.

At the time of the accident the crane manufactured by Koehring and owned by the Railroad was being used by Reese's crew to lift loaded pushcarts onto railroad flat cars. Reese was killed on February 22nd, 1968. The crane had been manufactured in 1966 and had been sold to the railroad in 1967 by an intermediate company. On delivery it had been inspected by McClaran, a member of the Reese crew who was operating the crane at the time of the accident, and McClaran's assistant. McClaran had no difficulty with the machine prior to the date of the accident. It was McClaran's duty to lubricate the machine daily. The crane consisted of a cab and a boom with two lines attached. Each of the lines was designed to carry a load of 6000 pounds. The lines wind and unwind on diesel powered drums which the operator controls by levers in the cab.

There are two sets of independent braking mechanisms. The mechanical brakes are operated by depressing foot pedals and may be locked by engaging notches in the pedal to floor plate latches by a movement of the foot. The second brake is the so-called "dog" or latch mechanism which engages cogs on, and locks, the drum so that the line can be held without

the need for applying the foot brake. The dog is manually raised from or lowered into the drum cog by means of a lever in the cab.

At the time of the accident there was a clamshell bucket—a 1200 pound bucket with jaws that open and close—attached close to the point of the boom, near the end of it, on the left line. The right line was being used for handling materials. McClaran had never previously used one line as a hoist while keeping an unused clamshell bucket suspended from the top of the boom by the other line.

The crane operator testified that immediately prior to the clamshell bucket falling on Reese, both braking mechanisms were engaged. He also testified that he heard a noise like "clang" when the accident occurred and the right foot brake jumped off the floor.

There is evidence that in order for the clamshell bucket to fall, both braking mechanisms had to fail. On the day following the accident employees of the railroad attempted to simulate the conditions by locking the dog lock mechanism in position and releasing the foot brake. On two out of five occasions the clamshell bucket fell until the foot brake was reapplied.

There was evidence that the foot brake pedal mechanism was defective in that one-half of the contact surface between the pedal and the plate was missing due to a casting defect. An expert witness testified that in his opinion the brake pedal released due to vibrations or other causes combined with the lack of the bearing surface. A metallurgical engineer concurred in this opinion. The mechanical expert also testified that in his opinion the design of the brake pedal was deficient principally in the fact that no provision was made in the design to keep it from sliding off the latching. The expert also testified, with regard to the second brake mechanism, that there was corrosion or rust on the dog pin or pivot which might prevent it from going into and engaging a cog on the drum, and also, that the metal used in the dog latch mechanism was too weak and could have been bent by constant use. He noted that it was impossible for the crane operator to see if the dog was in the latch, only being able to feel if it was engaged. There was a possibility that if the force was sufficient to dissipate it, the crane operator might think the dog latch mechanism was locked when it was not. He testified that he examined the lubricating chart and found no indication that the points in question on the dog lock mechanism should be lubricated and that it would be difficult and cumbersome to lubricate the points.

The defendant's experts contradicted the testimony on most points.

The cause for the failure of the dog latch mechanism is unclear from the record. McClaran testified that the foot brake held when he applied it as the bucket started to fall but he did not know whether the dog

lock mechanism was engaged. After the accident he did not check the dog lock mechanism. It is not clear whether the dog latch pivot was lubricated on a regular basis.

From the record it is clear that defendant was permitted to and did present the defense of misuse of the product by an alleged lack of lubrication of the dog pin by the Railroad and its servants, and further argued at some length that "human error" was the cause of the accident.

■■ We think that the evidence clearly shows that there was no allegation or proof of discovery of the defect before the accident to raise or establish any affirmative defense of assumption of the risk. Nor was there proof that misuse of the product within the *Williams* case caused the accident.

The judgment on the verdict in favor of the plaintiff and against Koehring is affirmed.

## II

In its separate appeal against Koehring of the decision on its counterclaim, the Railroad argues that the "Loan Receipt" executed by the plaintiff is a valid and enforceable obligation and not a covenant not to sue. The Railroad first claims error in the ruling of the trial court setting off against the verdict the amount paid by the Railroad to plaintiff.

The form of the agreement betwen plaintiff and the Railroad clearly evidences an obligation upon plaintiff to repay to the Railroad $57,500 from any judgment she is able to collect from Koehring. There is no agreement to either release the Railroad or to withhold suit against it.

Koehring maintains that the Railroad settled its liability to plaintiff by the agreement and thus, in effect, plaintiff entered into a covenant not to sue the Railroad. If the agreement was properly construed as a covenant not to sue, the trial court correctly reduced the verdict. (*N.Y.,C. & St. L.R.R.Co. v. Transit Lines* (1951), 408 Ill. 336, 342; *Aldridge v. Morris* (1949), 337 Ill.App. 369, 380-382; *Hulke v. International Manufacturing Co.* (1957), 14 Ill.App.2d 5, 24-31.) The Railroad, however, argues that the plain terms of the agreement must be given effect and that it cannot then be construed as a covenant not to sue.

■■ Admittedly, there is no Illinois authority directly construing the effect of a loan without interest repayable only if a codefendant is found liable and which results in a dismissal of the lender without prejudice. Applying the same principles of construction used to distinguish releases and covenants not to sue, it would seem that we should consider the words used, the amount paid, the substance of the agreement and the intention of the parties in reaching our determination of the effect of the writing. (*Hulke v. International Manufacturing Co.*, 14 Ill.App.2d 5, *supra.*) Applying these principles to this agreement we see no reason

to refuse to give effect to its plain terms. In these areas the underlying principle would appear to be the one which allows the plaintiff only one full compensation for his injury. We conclude that the verdict should not have been reduced but that the amount of the loan should be repaid to the Railroad from the proceeds of the verdict. This will not result in a double recovery to the plaintiff; nor will it leave Koehring in any different position than it would have been if the plaintiff had chosen not to sue the Railroad in the first instance. Authorities in other jurisdictions have given similar effect to loan agreements in a variety of situations. *Northern Indiana Public Service Company v. Otis* (1969), 250 N.E.2d 378, 393; *Bolton v. Ziegler* (1953), 111 F.Supp. 516; See also, Anno. 13 ALR2d 42.

We do not then reach the alternative argument of the Railroad that, if it is required to apply its payment to plaintiff in reduction of the verdict, it is entitled to be indemnified in full.

■■ However, we must still consider the further contention of the Railroad that it should be indemnified for its outlays, including investigation expenses and attorney's fees. Assuming without deciding that the nature of the Railroad's alleged fault in failing to lubricate or in otherwise misusing the machinery would not deprive it of the right to be indemnified against one found guilty under strict liability issues, we conclude that it would not necessarily follow that the right to indemnity would include these incidental expenses.

The Railroad's claim is premised upon the theory that it is entitled to be reimbursed for all expenses it incurred by reason of Reese's institution of suit against it. Reliance on *Suvada v. White Motor Co.* (1965), 32 Ill.2d 612, 614 and *Palmer House Co. v. Otto* (1952), 347 Ill.App. 198, both of which were decided on the pleadings, is, in our view, misplaced. In *Suvada*, while the court (at page 614) referred to the fact that the third-party plaintiffs were seeking to recover damages including legal services and investigation expenses, it did not reach the issue of what would be proper elements of damages. Nor is there any holding in the *Palmer House* case that such expenses are recoverable damages in an indemnity action. While the opinion (at page 201) refers to indemnity for "expenditures properly made in discharge of such liability", an analysis of the cases cited shows that the only expenditures held to be properly includible in an indemnity action are sums paid in a settlement or discharge of the judgment and costs. (There is no issue as to ordinary taxable court costs here.)

■■ Further, no case has been cited or found in Illinois which holds that expenses for investigation and trial preparation, together with attorney's fees, are elements of damage in an action for indemnity. The cases

in which an issue has been made as to whether "costs", as the term is used in an express contract of indemnity, may be implied to include attorney's fees and other expenses have held that such items are not included. We think it is a fair conclusion that expenses and attorney's fees are recoverable only where required by the specific terms of a written contract of indemnity. See *Wiegel v. One LaSalle Co.* (1966), 75 Ill.App.2d 272, 278.

In the primary suit the judgment is affirmed. The order entered below on December 15th, 1970, is reversed to the extent that it orders the set-off and reduction in the amount of the judgment by $57,500 paid by the Railroad to the plaintiff under the loan receipt agreement and the cause is remanded to the trial court with directions to amend its final judgment order accordingly. The judgment below finding in favor of Koehring and against the Railroad on the counterclaim for indemnity is affirmed.

Affirmed in part, reversed in part and remanded with directions.

T. MORAN and GUILD, JJ., concur.