RICHARD A. BARTSCH, Plaintiff-Appellee, v. GORDON N. PLUMB, INC., Defendant-Appellant (Gordon N. Plumb *et al.*, Intervening Plaintiffs-Appellants and Cross-Appellees, v. James M. Rogan *et al.*, Intervening Defendants-Appellees and Cross-Appellants.

First District (2nd Division)   No. 84—2000

Opinion filed September 24, 1985.—Modified on denial of rehearing December 3, 1985.

Ralph E. Brown and Theodore W. Grippo, Jr., both of Walsh, Case, Coale & Brown, of Chicago, for appellants Gordon N. Plumb and Ann C. Plumb.

Robert J. Trizna, of Trizna & Lepri, of Chicago, for appellee Richard A. Bartsch.

Winston & Strawn, of Chicago (Robert G. Foster and David B. Love, of counsel), for appellees James M. Rogan and Jack A. Nickol.

JUSTICE HARTMAN delivered the opinion of the court:

The circuit court entered a declaratory judgment, finding that: the lease involving lessor plaintiff Richard A. Bartsch and lessee defendant Gordon N. Plumb, Inc. (Plumb, Inc.), had terminated; Bartsch was entitled to possession of the premises, damages for Plumb, Inc.'s wrongful possession thereof, and reimbursement for attorney fees, costs and expenses; and intervening plaintiffs Gordon and Ann Plumb (Plumbs) were entitled to reimbursement from intervening defendants James M. Rogan and Jack A. Nickol, to the extent of the judgment ordered against Plumb, Inc., and in favor of Bartsch, occasioned by the Plumbs' detrimental reliance on certain misrepresentations made by Rogan and Nickol. The Plumbs and Plumb, Inc., appeal from this judgment. In a subsequent order, the circuit court modified the judgment by ordering Rogan and Nickol to

reimburse the Plumbs for their attorney fees, costs, and expenses incurred in their defense of the declaratory action. Rogan and Nickol cross-appeal from this order.

On August 6, 1982, Bartsch filed a verified complaint, among other things seeking a declaration that a lease for certain restaurant-bar premises entered into between Bartsch and Niro Development Corporation (Niro), the former name of Plumb, Inc., be terminated as of September 12, 1981, the end of its initial five-year term, and that Plumb, Inc., vacate the premises and be assessed damages as well as attorney fees and costs for its wrongful possession thereof.

The Plumbs intervened as plaintiffs on March 3, 1983, their complaint naming Rogan and Nickol as intervening defendants, essentially alleging that the Plumbs purchased the stock of Niro in 1979 from Rogan and Nickol, who had warranted in the purchase agreement that they knew of no facts which would involve the Plumbs in an action, suit, or other proceeding, and who represented to the Plumbs that the lease was valid and that the rental for the initial five-year lease period, as well as the two five-year renewal periods, was $600; and, that as the Plumbs relied upon these representations in purchasing Niro, Rogan and Nickol be required to "protect and indemnify" them to the extent of any order entered against Plumb, Inc., in Bartsch's underlying declaratory action.

The bench trial began on November 28, 1983, at which Bartsch testified that he had owned and operated the predecessor business on the premises in Palatine for five years prior to March 1976, when Rogan and Nickol offered him $100,000 for the business, exclusive of the real property. Subsequently, Rogan, an attorney, prepared a lease for the tavern premises. Three copies of the lease existed, one each for Bartsch, Rogan and Nickol. The lease did not contain a rent term, but referred to the rent "set forth in exhibit 'B' which is attached hereto and by this reference incorporated herein and made a part hereof." According to Bartsch, exhibit B was not attached to the lease at the time it was signed on September 13, 1976, nor was exhibit B ever provided to Bartsch, who became aware of it only in the last six months, after his attorney obtained what purported to be exhibit B from Rogan. The exhibit B so obtained provided that "[t]he rent for the demise[d] premises herein shall be $7,200 per year payable in equal monthly installments of $600 which shall be due on the 13th day of each month." Bartsch recounted that during negotiations with Rogan and Nickol prior to the closing, the rent agreed upon was $600 for the initial five-year term, and, for the two subsequent five-year renewal periods, would "be adjusted by the cost of living."

Bartsch asserted that he was given a copy of the lease in early September 1976, which he took to his attorney, George McCord. In McCord's office on the morning of the closing, September 13, 1976, McCord assured Bartsch that exhibit B "would be forthcoming in a few days." McCord was present at the closing, which took place at the tavern. In 1981, Bartsch received notice from Plumb, Inc., that it intended to exercise its option to renew the lease. Bartsch advised Plumb, Inc., that the rent would be increased to $1,200 per month, an amount unrelated to any cost of living increase indicia.

George McCord testified Bartsch came to his office during the first week of September 1976, with a copy of the lease and purchase agreement, but neither exhibits A (a legal description of the property) nor B were attached to the lease. Bartsch told him that the rent was fixed for the initial term, with an escalation tied to the cost of living for the option terms. McCord called Bartsch's attention to the fact that exhibit B was missing, which McCord did not see prior to closing. McCord never requested exhibit B either before or after the closing. He first saw exhibit B in July 1983.

Helen Bartsch, plaintiff's wife, testified that she owned the subject property in joint tenancy with her husband. During negotiations with Rogan and Nickol about two weeks before the lease was signed, she asked about rent increases for the renewal terms, and Rogan told her that the $600 per month rent would be increased for each of these terms based on government cost of living figures. She first saw a rent schedule while on the witness stand.

Michael Bayard testified as an expert on Bartsch's behalf, after his qualifications were tested on *voir dire*. His analysis of the instant lease and exhibit B conducted in July 1983, comparing the "crackle" patterns on the surface of the film-type ink used on the documents, led him to conclude that exhibit B was more recently written than the lease. Bayard also performed microchemical solubility tests on ink fragments. The ink from exhibit B dissolved twice as fast as ink from the lease, indicating that the ink on exhibit B had been exposed to atmospheric oxygen for less time. In his opinion, exhibit B was at least six months to a year of more recent origin than the lease.

Rogan testified that he was a shareholder in Niro, which he represented when Bartsch's tavern was purchased in September 1976. A flat rental was discussed during negotiations with Bartsch in March or April 1976. Bartsch said he was in financial straits and suggested $600 per month as rent, which would remain in effect for the option periods, when Rogan and Nickol could "make it up." No promise was made to condition the option rent on any cost of living index. When

Bartsch failed to prepare the lease, Rogan obtained a form lease from a fellow attorney and put it on a "Mag Card," a master form which could be reused as needed, with changes only in names and exhibits. The lease was typed on a Mag Card typewriter. He dictated exhibit B and it was prepared by his secretary on an IBM typewriter. Rogan gave exhibit B to Nickol, who worked as Bartsch's bartender, to deliver to Bartsch, in late August or early September 1976.

Rogan testified that after the closing, exhibit B was put in his office file by his secretary, where it became "misplaced" from September 1976 until early 1983. When Bartsch sued Plumb, Inc., for forcible entry and detainer in early 1981, Rogan had his secretary look for exhibit B, but she could not find it. Upon receiving Bartsch's notice to produce in the instant action, he went through his files "page by page" and found it. Rogan and Nickol made certain voluntary improvements to the premises: they refinished the bar, and installed a new ceiling, floor, wall bricking and kitchen counters. Rogan and Nickol sold the tavern business to the Plumbs on May 1, 1979. Rogan told the Plumbs that the rent was $600 for all periods.

Jack Nickol, called by the Plumbs as an adverse witness, testified that Rogan gave him exhibit B to deliver to Bartsch, which he did, in August 1976, telling Bartsch what it was when he gave it to him. At all lease negotiations, the rent was $600 per month, and no increase for the option terms was discussed. He received his own copy of exhibit B at closing, which he then put in the basement of the tavern.

Gordon Plumb testified that he purchased Niro for $185,000 and changed its named to Plumb, Inc., taking possession on July 1, 1979. A copy of the lease was delivered to him at closing, which he and his attorney examined. His attorney said that everything seemed in order. Plumb could not recall whether exhibit B was attached. He paid rent of $600 per month until the end of the initial term. He notified Bartsch of his intention to exercise the option to renew the lease, who refused his September 1981 $600 rent check and demanded $1,200. Plumb's attorney asked Rogan to find exhibit B, but he could not do so.

James Hayes, examiner of questioned documents, testifying as an expert on behalf of the Plumbs, compared the lease and exhibit B. Based on the watermarks, the paper used for each document was in existence on the date the lease was prepared. He also examined Bayard's written report, concluding that, according to a recognized treatise in the field, the solubility method of analysis was intended to determine the ages of writings on the same document; however, an

examination of "crackling" was not a valid means of determining age. He could not determine the date either document was created or refute the date of the lease. He could not say whether exhibit B or the lease was the older document.

The parties rested. On January 6, 1984, the circuit court announced its findings of fact and conclusions of law in some detail, finding, among other things, that exhibit B was not in existence at the time the lease was executed, and was not presented until after the instant suit had been filed; and to the extent that it may have existed after the lease was signed but before the suit was filed, it did not reflect the intention of the parties.

On February 14, 1984, judgment was entered which found: that the lease terminated on September 12, 1981, and could not be renewed; Plumb, Inc.'s retention of the premises was unlawful, as Bartsch was entitled to possession after September 13, 1981; and Bartsch was damaged by the unlawful possession to the extent of $1,200 per month. The judgment ordered Plumb, Inc., to vacate the premises within 30 days; Plumb, Inc., to pay Bartsch damages through February 1984 in the amount of $36,000; and to pay attorney fees, costs, and expenses in the amount of $15,598.97.

As to the intervening action, the judgment found: that Rogan and Nickol had made material misrepresentations to the Plumbs which were relied upon in their purchase of Niro; the Plumbs were damages by Rogan's and Nickol's breach of warranties regarding the lease terms, to the extent of the judgment entered against Plumb, Inc., and in Bartsch's favor; Rogan and Nickol were ordered to pay the Plumbs $600 per month from September 13, 1981, until the premises were vacated, as well as all attorney fees, costs, and expenses which Plumb, Inc., must pay to Bartsch under the order; and judgment was entered in favor of the Plumbs and against Rogan and Nickol in the amount of $18,000, plus $15,598.98 for fees, costs and expenses.

After Plumb, Inc., the Plumbs, and Rogan and Nickol filed post-trial motions, the circuit court entered an order on April 18, 1984, modifying the judgment to order Rogan and Nickol to reimburse the Plumbs for the attorney fees, costs, and expenses incurred in their defense of the declaratory judgment action brought by Bartsch against Plumb, Inc. Rogan filed a second post-trial motion on May 9, 1984.

On July 11, 1984, a final judgment was entered which: denied Rogan's and Nickol's and Plumbs' post-trial motions; awarded the Plumbs, as against Rogan and Nickol, their fees, costs and expenses

in the amount of $8,487.75; ordered Plumb, Inc., to vacate by August 10, 1984; ordered judgment consistent with the judgment order of February 14, 1984, as modified; and granted Plumb, Inc.'s motion for a stay of enforcement, pending deposit of an appeal bond. Plumb, Inc.'s motion for reconsideration was denied on August 9, 1984. This appeal followed.

I

Plumb, Inc., the Plumbs, and Rogan and Nickol (collectively defendants) contend that the circuit court erred by finding that the lease terminated by operation of the statute of frauds.

■■ Under our Statute of Frauds, "[n]o action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith *** ." (Ill. Rev. Stat. 1983, ch. 59, par. 2.) A lease for a term of more than one year must be in writing and, at a minimum, contain the names of the parties, a description of the leased property, the amount of the rent, and the term of the lease. (*Daehler v. Oggoian* (1979), 72 Ill. App. 3d 360, 366, 390 N.E.2d 417.) The circuit court here determined that exhibit B containing the essential rent term for the option periods was not in existence when the lease was executed, and was not presented to Bartsch until after the instant action was commenced. That determination is sufficiently supported by the record, as noted in part VII of this opinion. The lease thus failed to comply with the statute of frauds. See *Lipkin v. Koren* (1946), 392 Ill. 400, 408, 64 N.E.2d 890.

Defendants argue that the absence of the rental amount was an "ambiguity" which could have been resolved by the admission of parol evidence; accordingly, the court should have supplied this missing term by reference to evidence concerning the lease negotiations and the conduct of the parties subsequent to the execution of the lease. We disagree.

■■ Parol evidence not inconsistent with a written instrument is admissible to explain or illuminate terms otherwise uncertain or ambiguous. (*Borg-Warner Corp. v. Anchor Coupling Co.* (1958), 16 Ill. 2d 234, 241, 156 N.E.2d 513; *Stone v. Mulvaine* (1905), 119 Ill. App. 443, 454, *aff'd* (1905), 217 Ill. 40.) The instant lease, however, is not ambiguous, but is missing an essential term, which cannot be supplied by parol evidence. (See *Borg-Warner Corp. v. Anchor Coupling Co.* (1958), 16 Ill. 2d 234, 156 N.E.2d 513; *Hanlon v. Hayes* (1949), 404

Ill. 362, 368, 89 N.E.2d 51.) The circuit court did not err by finding the instant lease invalid.

## II

The Plumbs urge that the circuit court erred by failing to award them the value of their investment in the tavern business as against Rogan and Nickol. In their intervening complaint, the Plumbs alleged that they would be "damaged to the extent of any order entered against them" in Bartsch's favor. In finding that Rogan and Nickol were liable to the Plumbs on a warranty theory, the circuit court ordered that Rogan and Nickol pay to the Plumbs the excess over the $600 per month rental that had been warranted, as well as both Bartsch's and the Plumbs' attorney fees and costs. The Plumbs insist that the $185,000 they paid for the tavern business should also have been allowed.

The Plumbs, however, did not raise this issue in the circuit court until their post-trial motion. Moreover, no evidence was adduced regarding the nature or amount of such damages. Although the amount the Plumbs paid was established, there was nothing to indicate that this represented the current value of the business.

■ The Plumbs contend that the measure of damages in a breach of contract action is the amount which would place the aggrieved party in as satisfactory a position as he would have been had the contract been performed. (*Student Transit Corp. v. Board of Education* (1979), 76 Ill. App. 3d 366, 369, 395 N.E.2d 69; *Menicocci v. Archer National Bank* (1978), 67 Ill. App. 3d 388, 392, 385 N.E.2d 63.) Liability here, however, was based upon breach of warranty, not contract. The Plumbs' intervening complaint prayed that the court should "protect and indemnify" them "from any finding and judgment" in the present action. This language does not encompass the additional affirmative relief the Plumbs are now seeking, especially since the Plumbs' attorney in closing argument did not mention his clients' loss of investment. We find no error here.

## III

Defendants insist Bartsch admitted that the rent for the option periods was $600 per month by claiming this amount in complaints filed in a separate forcible entry and detainer action.

A judicial admission is a formal act of a party or his attorney in court, dispensing with proof of the fact admitted. (*Baker-Wendell, Inc. v. Edward M. Cohon & Associates, Ltd.* (1981), 100 Ill. App. 3d 924, 928, 427 N.E.2d 317; *Malauskas v. Tishman Construction Corp.*

(1980), 81 Ill. App. 3d 759, 761, 401 N.E.2d 1013.) An admission in a verified pleading is considered a judicial admission, conclusive against the pleader, for purposes of the same action. (*Malauskas v. Tishman Construction Corp.* (1980), 81 Ill. App. 3d 759, 762; *Precision Extrusions, Inc. v. Stewart* (1962), 36 Ill. App. 2d 30, 50-51, 183 N.E.2d 547.) Admissions in unverified pleadings, however, are considered admissions against interest, which are not conclusive against the pleader and may be explained or contradicted. (*Malauskas v. Tishman Construction Corp.* (1980), 81 Ill. App. 3d 759.) Moreover, verified or unverified admissions in pleadings in other actions, or those which have been amended, abandoned, or withdrawn, also constitute non-binding evidential admissions. See *Chambers v. Appel* (1945), 392 Ill. 294, 306-07, 64 N.E.2d 511; *Precision Extrusions, Inc. v. Stewart* (1962), 36 Ill. App. 2d 30, 183 N.E.2d 547.

■ In the case *sub judice*, the court admitted into evidence the complaint and amended complaint filed by Bartsch in an earlier forcible entry and detainer action, each seeking damages amounting to $600 per month for the period beginning September 13, 1981. Although notarized, neither verification clause in these complaints was signed. As unverified pleadings, and, more importantly, as pleadings in another action which were, in fact, withdrawn by virtue of Bartsch's voluntary dismissal of the earlier action, the complaints were properly admitted as admissions against interest; they did not, however, constitute judicial admissions. Testimony by Bartsch and his wife as to the escalating rent for the option periods, contradicting the amounts claimed in the complaints, was thus properly considered by the court.

## IV

Defendants next assert that the circuit court erred by failing to find that part performance under the lease took the entire lease, including the option periods, out of the operation of the Statute of Frauds.

The Statute of Frauds will be held inapplicable where one party to an executory contract has so far performed his part of the contract that it would be tantamount to the perpetration of a fraud to allow the other party to repudiate the contract. (*McGrory v. McCormick* (1948), 400 Ill. 203, 207-08, 79 N.E.2d 485.) Taking possession and making valuable improvements on property under a lease may constitute sufficient part performance to take a renewal option, an integral part of a lease, out of the statute of frauds. *Meyer v. Surkin* (1931), 262 Ill. App. 83, 90. See also *Garlick v. Imgruet* (1930), 340 Ill. 136,

146, 172 N.E. 164; *Hindu Incense Manufacturing Co. v. MacKenzie* (1949), 403 Ill. 390, 394, 86 N.E.2d 214.

■ Defendants argue that Rogan's and Nickol's taking possession and subsequent valuable improvements to the leasehold, as well as defendants' payment and Bartsch's acceptance of $600 per month during the initial term, sufficed to remove the option periods from the operation of the Statute of Frauds. The case relied upon by defendants, *Meyer v. Surkin*, is distinguishable from the instant situation, however. There, the Statute of Frauds question concerned the authority of an agent to bind a lessor to a lease which contained a renewal option, the terms of which, unlike here, were clearly set forth in the instrument. Moreover, the instant valuable improvements were not required by the terms of the lease, but concededly were made voluntarily by Rogan and Nickol. It cannot be said, therefore, that the interposition of the Statute of Frauds to invalidate the renewal options here was tantamount to the perpetration of a fraud.

Defendants further argue that the parties' acquiescence to the $600 rental for the initial term, when considered in light of the lease's language granting to the lessee the right to renew the lease "upon the same terms," established the rent as $600 per month for the option periods. This argument, however, ignores the circuit court's determination that exhibit B, which presumably reflected the rental amounts and is certainly among the "terms" referred to by the quoted clause, did not come into existence until after the lease was executed and did not reflect the intention of the parties. The court's application of the Statute of Frauds was proper.

## V

Defendants urge that the circuit court's award of damages in the amount of $1,200 per month for Plumb, Inc.'s wrongful possession was without a proper basis in the record. We must agree.

In the instant case, the only testimony concerning the rental for the initial renewal period was that of Bartsch himself. When asked why he sent the Plumbs a letter requesting $1,200 for this period, he responded that "[t]he figure was given to me by a realtor in Palatine," who had told him "that he felt the property was worth $1,200 a month in rental." Defendants' objection on hearsay grounds was sustained by the court, which struck Bartsch's testimony "as to what the realtor told him. But the fact that he made a rent increase based on a conversation with a realtor may stand." No further evidence on this issue was adduced. In its findings, the court stated, without elaboration, that Bartsch was entitled to rental of $1,200 after September

13, 1981.

A witness rendering an opinion as to the value of property must demonstrate his qualifications. (*City of Elmhurst v. Rohmeyer* (1921), 297 Ill. 430, 438-39, 130 N.E. 761.) Although any qualified individual may thereafter give such an opinion, there must be a preliminary showing of the factors upon which this opinion is based, and where improper elements have been considered, the testimony is incompetent and must be stricken. (*City of Chicago v. Giedraitis* (1958), 14 Ill. 2d 45, 51, 150 N.E.2d 577.) Accordingly, such a witness must base his opinion on actual, personal knowledge of property values in a particular area, rather than knowledge derived from outside parties. *City of Elmhurst v. Rohmeyer* (1921), 297 Ill. 430, 438-39; *Forest Preserve District v. Krol* (1957), 12 Ill. 2d 139, 147, 145 N.E.2d 599.

■ The foregoing authorities involve the valuation of realty, not the rental value of commercial property; nevertheless, the principles underlying these cases are applicable. Here, the circuit court properly struck as hearsay Bartsch's testimony as it related to what the realtor told him about a reasonable rental. By so doing, Bartsch's assignment of $1,200 as a rent figure was left without a foundation. Bartsch's contention that his experience in the restaurant and bar business in the area qualified him to render an opinion must be rejected, as he admittedly based his opinion on impermissible hearsay, not on his own knowledge and experience. The award of $1,200 per month as damages was therefore not supported by any competent evidence in the record and must be reversed and remanded.

## VI

Defendants argue that the circuit court improperly refused to adjudicate the Plumbs' claim that rent payments made by Plumb, Inc., to the Plumbs, as assignees of a rent assignment made by Bartsch, should be credited to Plumb, Inc.

Gordon Plumb testified that the bank holding Bartsch's mortgage on the subject property and on other property in McHenry County advised the Plumbs that the mortgage was in default. On March 1, 1982, the Plumbs purchased Bartsch's mortgage from the bank, which assigned to the Plumbs Bartsch's notes, mortgage, and assignment of rents. After notifying Bartsch of the bank's assignment on March 9, 1982, the Plumbs received no mortgage payments from Bartsch. On April 5, 1982, the Plumbs notified Bartsch that he was in default under the mortgage. About one or two months after the Plumbs notified Bartsch that they were assignees of the rents, rents were paid by Plumb, Inc., to the Plumbs. A foreclosure action based on Bartsch's

mortgage default was then initiated in McHenry County. The Plumbs argue that the circuit court's reliance on the pendency of the McHenry County action as a basis for its refusal to adjudicate this issue was misplaced, as the McHenry County action, involving the separate parcel located in that county, had already gone to judgment when the court here made its ruling.

■ Notwithstanding the Plumbs' assertion, the circuit court's refusal to adjudicate this issue was proper in that the Plumbs failed to plead the assignment of rents as a setoff, another factor cited by the court for its abstention. A party cannot be afforded relief, despite the admission of evidence supporting such relief, absent a corresponding pleading. (*Burke v. Burke* (1957), 12 Ill. 2d 483, 487, 147 N.E.2d 373; *Shehy v. Bober* (1979), 78 Ill. App. 3d 1061, 1068, 398 N.E.2d 80.) Here, the Plumbs' answer to Bartsch's complaint, as well as their intervening complaint, made no mention of the rent assignment nor sought credit for rents paid thereunder. The Plumbs argue that, under section 2—608 of the Code of Civil Procedure, language indicating that a setoff "may" be pleaded implies that relief may be granted even in the absence of a specific pleading. (Ill. Rev. Stat. 1983, ch. 110, par. 2—608.) The election afforded by section 2—608, however, merely permits a party to plead its claim in a separate action. See *Miller v. Bank of Pecatonica* (1980), 83 Ill. App. 3d 424, 427, 403 N.E.2d 1262.

The Plumbs maintain that it was unnecessary for them to plead a setoff, as the payments made to them by Plumb, Inc., were rental payments, which had been placed in issue by their pleadings and were the central element of damages in the action. This contention is contradicted by the Plumbs' actions during the course of the instant litigation. The circuit court in its findings cited as yet another basis for its abstention on this issue Plumb, Inc.'s verified reply to Bartsch's motion to compel rental payments, filed on November 29, 1982, which alleged that "the question of Plaintiff's mortgage default is the current subject of Litigation *** in McHenry County, Illinois," and prayed that "the Court leave the issue of Plaintiff's default and the Plaintiff's Assignment of Rents to the pending foreclosure suit in McHenry County." The allegations in this motion were not withdrawn prior to trial. It was not until Plumb, Inc., filed its post-trial motion that the instant issue was asserted in a pleading. Thus, in reliance on Plumb, Inc.'s own motion, which by implication conceded that its other pleadings did not frame the instant issue, the court correctly refused to decide such issue. In view of the court's abstention, the Plumbs may initiate a separate action to adjudicate this matter, pro-

vided they are not otherwise precluded from so doing.

## VII

Because their testimony concerning the presence of exhibit B at the closing was neither contradicted nor refuted at trial, citing *In re Estate of Davison* (1981), 102 Ill. App. 3d 644, 430 N.E.2d 222, Rogan and Nickol contend that the circuit court's finding that exhibit B was not in existence at the time of the closing was against the manifest weight of the evidence.

Rogan's and Nickol's focus on the closing itself, however, ignores other facts and circumstances which, in their totality, support the court's determination. Rogan's and Nickol's testimony as to the delivery of exhibit B to Bartsch prior to the closing was directly contradicted by Bartsch. McCord supported Bartsch's account when he testified that he did not see a copy of exhibit B prior to closing, did not recall seeing one at the closing, and first saw one after the instant suit had began. Also supportive was expert witness Bayard's opinion, that exhibit B was at least six months to a year newer than the lease. Rogan's and Nickol's testimony regarding the lease negotiations, moreover, was contradicted by both Bartsch and his wife. Finally, the circuit court noted other circumstances which supported the inference that exhibit B was not in existence at the time of the closing: that of four copies of exhibit B allegedly prepared by Rogan, the only one to surface was Rogan's, which he found when he personally searched his office, some seven years after the lease was executed; the secretary who at Rogan's instance had earlier unsuccessfully searched for the document had not been called to testify and there was no explanation as to why her search was unsuccessful; exhibit B was neither signed nor initialed; and, the separate schedule was more consistent with an escalation of rent than with a flat rent.

■ "Manifest weight" is defined as "the clearly evident, plain and indisputable weight of the evidence." (*Gettemy v. Grgula* (1975), 25 Ill. App. 3d 625, 628, 323 N.E.2d 628.) Further, a reviewing court must view the evidence and reasonable inferences drawn therefrom in an aspect most favorable to the prevailing party, in this instance Bartsch. (*Sorenson v. Fio Rito* (1980), 90 Ill. App. 3d 368, 370, 413 N.E.2d 47.) Applying these standards, we cannot say that the circuit court erred by finding that exhibit B was not in existence at the time of the closing.

## VIII

Rogan and Nickol urge that the circuit court erred by permitting

Michael Bayard to testify as an expert witness, noting first that Bayard did not have a college degree. A witness whose knowledge is based on practical experience, however, is no less an expert than one who possesses particular academic or scientific knowledge. (*Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 728, 449 N.E.2d 250.) Here, Bayard testified concerning his years of experience as a research microscopist, including his prior work involving the comparison dating of documents.

■■ Rogan and Nickol observe that Bayard had never before testified regarding document dating. Any relevance this might have would affect only the weight, not the admissibility, of Bayard's testimony. The same rationale applies to Rogan's and Nickol's further assertions that Bayard: did not belong to any association of experts in document dating; had never published in the field of document dating; could not identify any authoritative texts on document dating; and did not perform other, more accurate tests. As to the last factor, Bayard noted that other tests were not performed because only nondestructive testing had been required of him.

■■ Rogan and Nickol argue that Bayard made assumptions not of record, citing testimony that he assumed that the paper, typewriter ribbons, and the finished documents ultimately tested had been stored under "normal" conditions, such as those in a home or office environment. An expert may assume that certain things are true, provided they are within the realm of direct or circumstantial evidence, supportable by the facts or reasonable inferences which can be drawn therefrom. (*Smith's Transfer Corp. v. Industrial Com.* (1979), 76 Ill. 2d 338, 350, 392 N.E.2d 14; *Buford v. Chicago Housing Authority* (1985), 131 Ill. App. 3d 235, 245, 476 N.E.2d 427.) Here, Rogan testified that exhibit B had been misplaced in his office files from September 976 until early 1983. Bayard testified that, if the documents had been typed at the same time, exhibit B would have had to have been stored in "very unusually good conditions *** close to a hermetically controlled or sealed environment." Bayard's assumption that the documents and other items were stored under "normal" conditions was supported by the evidence and inferences which could be drawn therefrom. Moreover, expert testimony couched in terms of probabilities based on assumed facts is not inadmissible or improper. *Beloit Foundry v. Industrial Com.* (1976), 62 Ill. 2d 535, 539, 343 N.E.2d 504; *Buford v. Chicago Housing Authority* (1985), 131 Ill. App. 3d 235, 476 N.E.2d 427.

Rogan and Nickol argue that Bayard's only two prior experiences with document dating were at least 10 years earlier, further pointing

out that the instant tests compared only two documents, while his prior analyses compared the subject documents with hundreds of documents known to have been typed at different times. Again, these considerations go to the weight, rather than the admissibility, of his testimony. Bayard's earlier analyses were calculated to determine the exact time frame of a document; therefore, many "background" documents of known ages were needed for comparison. Here, the comparison involved only two documents, the objective being to determine their age with respect to one another, rather than to date them exactly. Bayard's previous experience sufficiently qualified him to make such a determination.

Finally, Rogan and Nickol maintain that Bayard's expertise in the general field of microscopy does not render him an expert in the more specialized field of document dating. As was noted, Bayard's prior experience with document dating and comparison, though limited, was nevertheless sufficient to qualify him here. His experience thus distinguishes the instant situation from those in cases relied upon by Rogan and Nickol. (*Cf. Broussard v. Huffman Manufacturing Co.* (1982), 108 Ill. App. 3d 356, 362, 438 N.E.2d 1217; *McCormick v. Bucyrus-Erie Co.* (1980), 81 Ill. App. 3d 154, 164-65, 400 N.E.2d 1009; *Gannon v. Freeman* (1982), 103 Ill. App. 3d 917, 431 N.E.2d 1303; *Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1979), 68 Ill. App. 3d 75, 79-80, 385 N.E.2d 376; *Harris v. City of Granite City* (1977), 52 Ill. App. 3d 782, 785, 365 N.E.2d 1034; *City of Chicago v. George F. Harding Collection* (1966), 70 Ill. App. 2d 254, 271-72, 217 N.E.2d 381.) The circuit court did not err by permitting Bayard to testify as an expert.

## IX

In their cross-appeal, Rogan and Nickol assert that the circuit court erred by assessing against them the attorney fees, costs and expenses of Bartsch and the Plumbs.

In its judgment of February 14, 1984, the court awarded attorney fees, costs, and expenses in the amount of $15,598.97 to Bartsch as against Plumb, Inc., which were passed on to Rogan and Nickol on a breach of warranty theory. On April 1, 1984, the judgment was modified to allow for the fees, costs and expenses incurred by the Plumbs in the defense of Bartsch's declaratory judgment action. The amount of such fees, costs and expenses was later set at $8,487.75. Rogan and Nickol contend that both awards were made without statutory or contractual authority, required in Illinois before such expenses may be awarded to a successful litigant. See *Kerns v. Engelke* (1979), 76 Ill.

2d 154, 166, 390 N.E.2d 859.

Acknowledging the absence of a statutory basis for his fee award, Bartsch points to the lease itself as providing the necessary contractual authority. Although in his complaint, Bartsch invoked article 10 of the lease which provided that, in the event of default, he would be entitled to recover "as additional rent, all costs and expenses, including court costs and attorneys' fees incurred by LESSOR in the enforcement of its rights and remedies hereunder," his attorney represented to the court that Bartsch was seeking damages, not rents; damages not tied to the lease agreement, but Bartsch's asserted entitlement to damages outside of the lease agreement. The remedies expressly sought by Bartsch, therefore, were outside the lease. Article 10, which permitted a fee award only where the lessor sought enforcement "as additional rent" of its "rights and remedies hereunder," did not supply the requisite contractual authority for the circuit court's award. The contractual right to fees is established only where required by the specific terms of a written indemnity agreement. (*Reese v. Chicago, Burlington & Quincy R.R. Co.* (1972), 5 Ill. App. 3d 450, 458, 283 N.E.2d 517, *aff'd* (1973), 55 Ill. 2d 356.) The lease, therefore, did not supply the contractual basis for Bartsch's fee award, under the circumstances presented here.

The circuit court's error in awarding fees to Bartsch is demonstrated by the decision in *Arrington v. Walter E. Heller International Corp.* (1975), 30 Ill. App. 3d 631, 642, 333 N.E.2d 50, where the appellate court held that a lease provision, requiring a tenant to pay the landlord's attorney fees and expenses in enforcing the lease, did not apply where the landlord had brought a declaratory judgment action, seeking thereby to have rights declared, rather than enforced. Here, Bartsch's declaratory judgment action sought to have the lease at issue declared terminated as of September 12, 1981, and requested $1,200 per month for Plumb, Inc.'s wrongful retention of the premises after that date. As previously observed, at trial, Bartsch repeatedly emphasized that he was seeking damages outside the lease, rather than rents. There was thus no statutory or contractual basis for awarding Bartsch's fees in the instant case.

Although the Plumbs' fee award also appears to be lacking the requisite statutory or contractual authority, it was permissible under the following third-party suit exception to the general rule: where the wrongful acts of one party involve a second party in litigation with a third party, or place the second party in a position making it necessary for him to incur expenses in protecting his interests, that party can recover as damages the reasonable expenses, including at-

torney fees, of such litigation. (*Ritter v. Ritter* (1943), 381 Ill. 549, 554, 46 N.E.2d 41.) In *Insurance Co. of North America v. J.L. Hubbard Co.* (1974), 23 Ill. App. 3d 254, 262, 318 N.E.2d 289, the appellate court restricted this exception to situations in which: (1) the party seeking fees was forced to preserve property rights in real estate due to the wrongful acts of another, which caused litigation expenses against a third party; and (2) the conduct complained of was "wilful, wanton, malicious, oppressive, or at least as being of an active tortious nature." In the case *sub judice*, although the first requirement was met, Rogan and Nickol argue that their conduct was not "of an active tortious nature." In its findings, however, the circuit court deemed that Rogan and Nickol had made material misrepresentations which had induced the Plumbs to purchase Niro. Although liability was based on breach of warranty, such misrepresentations can be characterized as "actively tortious." Moreover, the record here does not reflect the court's reasons for ordering this latter fee award, as the report of proceedings, at which the fee award (requested in the Plumb's post-trial motion) was presumably argued and ordered, is not included. In the absence of a proper record, which should have been provided by Rogan and Nickol as cross-appellants, it must be presumed that the court's decision was supported by sufficient proof. *Ladenheim v. McCormick* (1978), 66 Ill. App. 3d 188, 192, 383 N.E.2d 751.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County, but reverse and vacate that portion of the judgment awarding attorney fees, costs and expenses to Bartsch, and reverse and remand for further proceedings that portion awarding Bartsch damages in the amount of $1,200 per month for Plumb, Inc.'s holdover tenancy.

Affirmed in part; reversed and vacated in part; reversed and remanded in part.

STAMOS, P.J., and BILANDIC, J., concur.