2025 IL App (3d) 240298

Opinion filed October 6, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | |
|---|---|
| GLOBAL RESEARCH DISTRIBUTION, INC., <br><br> Plaintiff-Appellant and Cross-Appellee, <br><br> v. <br><br> ONE STOP MAILING LLC, <br> d/b/a One Stop Worldwide, <br><br> Defendant-Appellee and Cross-Appellant. | Appeal from the Circuit Court <br> of the Eighteenth Judicial Circuit, <br> Du Page County, Illinois. <br><br> Appeal No. 3-24-0298 <br> Circuit No. 23-LA-0568 <br><br> The Honorable <br> Angelo J. Kappas, <br> Judge, presiding. |

_____

JUSTICE ANDERSON delivered the judgment of the court, with opinion.
Justices Hettel and Davenport concurred in the judgment and opinion.

_____

**OPINION**

¶ 1    The James Farley Post Office in New York City bears an inscription: "Neither snow nor rain nor heat nor gloom of night stays these couriers from the swift completion of their appointed rounds." This case involves private mail services that did not go as well as James Farley would have hoped. Global Research Distribution, Inc. (Global) hired One Stop Mailing LLC (One Stop) to prepare mailings and provide them to the U.S. Postal Service (USPS) for delivery. Global's mailings were to be sent on behalf of its customer Broadridge Financial Solutions (Broadridge). The mailings were sent late, and Global sued One Stop for breach of contract.

¶ 2        The trial court found that Global adequately alleged the existence of an implied-in-fact contract with One Stop. However, the court dismissed Global's claims, finding that it could not adequately establish damages. Global appeals from that ruling. One Stop also appeals, contending that the trial court incorrectly denied its request for attorney fees. We affirm in part and reverse in part, and remand.

¶ 3                                    I. BACKGROUND

¶ 4        According to the amended complaint, Global prepares companies' large-scale bound mailings for delivery to USPS, with a focus on mailings relating to corporate governance, capital markets, and wealth and investment management. One Stop similarly provides mail processing and delivery services, including special pickups and processing to boost postal service delivery times. One Stop operates from facilities that include a York, Pennsylvania, location.

¶ 5        Global contacted One Stop in December 2018 about processing mailings for Broadridge, to be picked up from a Long Island, New York, location and processed in One Stop's York facility. Global advised One Stop that Broadridge was a very important customer to Global and that Broadridge's materials were time sensitive. A One Stop executive represented to Global that One Stop could process Broadridge materials and fully track them in two to five days, the industry standard Global expected for time sensitive materials. Global, One Stop, and Broadridge met at One Stop's York facility in February 2019 to discuss whether One Stop could meet Broadridge's processing needs. Global had One Stop perform a "test run" by picking up test mailings from Broadridge in Long Island and delivering the materials to York for processing. Based on the success of the test run, Global and One Stop agreed that One Stop could process the Broadridge mailings.

2

¶ 6    Global and One Stop negotiated and exchanged several drafts of written contracts but did not execute a written agreement. Still, they began mail processing transactions in accordance with the commercially reasonable standards of their industry, and at agreed pricing terms, supported by a signed credit application and the presentation and payment of invoices. Between 2019 and early 2021, their customary practice had One Stop receiving, processing, and sending numerous mailings for postal delivery, followed by One Stop securing payment by transmitting an invoice reflecting the date, services, and price to Global for payment.

¶ 7    Despite their now-regular transactions, Global did not have One Stop begin processing Broadridge-related materials until May 2020. Those materials were to be processed under the same terms of agreement the parties had been operating under for the non-Broadridge customers, with the added condition that the Broadridge materials were time sensitive. One Stop was to arrange pick up of the Broadridge mailings and delivery to the York facility, where the materials would be processed and submitted to USPS for delivery, with One Stop then invoicing Global. One Stop processed over 400 deliveries of Broadridge materials for Global, representing nearly 2 million pieces of mail, at their agreed pricing rate, between May 2020 and March 2021.

¶ 8    In late 2020, Global requested that One Stop deliver to USPS proxy statements from Broadridge for Global's client Devon Energy. One Stop was made aware the mailing was for Broadridge and involved time sensitive proxy statements. Global expected that the proxy statements would be prepared and delivered to USPS within the already established turn-around time for Broadridge mailings. One Stop picked up the Broadridge proxy statements on December 1, 2020, and took them to its York facility. But, One Stop did not process and deliver the proxy statements until approximately a month later.

3

¶ 9 One Stop submitted invoices to Global from December 2020 to March 2021, which included charges for the tardy Devon Energy proxy mailing. Global did not pay the invoice amounts. Global sent a letter to One Stop on August 31, 2021, memorializing that (a) One Stop breached its obligation to timely process and deliver the Broadridge materials, (b) Global suffered damages in the form of reimbursements to Broadridge for fees and costs related to the Devon Energy project, and (c) Global suffered the loss of future Broadridge business. One Stop responded on October 19, 2021, denying any liability to Global and stating that Global owed One Stop $178,668.64 for unpaid invoices, including invoices for the disputed Broadridge proxy mailing.

¶ 10 In December 2021, this conflict culminated in One Stop suing Global. That lawsuit (Du Page County circuit court No. 2021-L-1352) was separate from the current dispute, but its resolution is relevant to the instant case. In that case, One Stop sought payment for the unpaid December 2020 to March 2021 invoices, including invoices related to the Broadridge proxy mailing, in an amount of $178,668.64, plus interest. In November 2022, One Stop and Global entered into what is loosely referred to as a settlement agreement.[1] The agreement required Global to pay One Stop $168,668.64 in exchange for dismissal of One Stop's lawsuit without prejudice. The settlement agreement contains no releases by either party and states that there is no admission of any liability by either party. The agreement further states that both Global and One Stop agree to "reserve all claims, including but not limited to, those brought in [One Stop's 2021 lawsuit], but [Global] will be credited for the Settlement Amount in full against any such One Stop claims." It also contains a fee-shifting provision allowing the "prevailing" party to recover reasonable

[1]The agreement is substantively more akin to a standstill agreement. However, we will adhere to the parties' label and reference it as a settlement agreement.

4

attorney fees and costs in "any litigation to enforce" the settlement agreement. One Stop's lawsuit was subsequently dismissed without prejudice.

¶ 11    In June 2023, Global filed its original complaint in *this* case. The circuit court dismissed the original complaint without prejudice on One Stop's motion pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2022)) and granted Global leave to file an amended complaint. Global filed its amended complaint on November 1, 2023.

¶ 12    The amended complaint has only one count, alleging that Global and One Stop entered into a valid and binding contract under which One Stop was obligated to "prepare and deliver certain proxy statements to the U.S. Postal Service within a reasonable amount of time of receipt" and that One Stop breached the contract when it took nearly a month to prepare and deliver the Broadridge-Devon Energy proxy statements. The amended complaint alleges three forms of damages: (a) "millions of dollars" in lost profits relating to expected future business dealings with Broadridge; (b) approximately $600,000 in attorney fees and expenses Global paid to Broadridge, which Broadridge, in turn, paid to its client Devon Energy; and (c) "$78,508.78 in unearned fees" that Global paid One Stop as part of the agreement that ended One Stop's lawsuit against Global.

¶ 13    One Stop moved to dismiss Global's amended complaint pursuant to section 2-619.1 (*id.* § 2-619.1). In February 2024, the circuit court held a hearing on the motion and determined that Global had adequately pled the existence of an implied-in-fact contract between Global and One Stop. However, the circuit court rejected Global's claims for damages on section 2-615 grounds (*id.* § 2-615).

¶ 14    On April 3, 2024, Global represented to the circuit court that it had pled no other theories of damages besides the three already claimed, and the court dismissed the amended complaint with prejudice. The court entered a final order that dismissed the amended complaint with prejudice.

¶ 15 After the trial court dismissed Global's amended complaint, One Stop filed a fee petition based on the fee-shifting provision in the parties' November 2022 settlement agreement. The trial court denied the fee petition, concluding that the "attorneys' fee provision is only applicable to claims arising under the settlement agreement and not any subsequent claims." The trial court further held that One Stop could not recover any fees because Global "did not seek to enforce the settlement agreement" in the amended complaint, but instead had filed a subsequent separate action to recoup the monies paid for invoices as damages, "because Global "believed [it] had a right to do so." The circuit court also stated it was exercising its discretion to deny One Stop's cost petition based on section 5-118 of the Code (*id.* § 5-118).

¶ 16 Global timely filed its notice of appeal seeking reversal of the trial court's order dismissing the amended complaint for want of cognizable damages. One Stop filed a cross-appeal, seeking reversal of the trial court's decision to deny One Stop's claim for fees and costs.

¶ 17                                II. ANALYSIS

¶ 18 A motion to dismiss pursuant to section 2-619.1 (*id.* § 2-619.1) of the Code allows parties to blend motions brought pursuant to section 2-615 (*id.* § 2-615) and section 2-619 (*id.* § 2-619) into one pleading but requires the combined motion to be divided into parts, with each part limited to the points or grounds of either section 2-615 or section 2-619. *Id.* § 2-619.1. The trial judge dismissed the case ostensibly on section 2-615 grounds for failure to allege damages.

¶ 19 "[A] motion to dismiss under section 2-615 differs significantly from a motion for involuntary dismissal under section 2-619." *Becker v. Zellner*, 292 Ill. App. 3d 116, 122 (1997). "[A] section 2-615 motion is based on the pleadings rather than on the underlying facts." *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 29 (2003). A section 2-615 motion is solely concerned with defects on the face of the complaint. *Becker*, 292 Ill. App. 3d at 122. It admits "all well-pleaded facts and

6

attacks the legal sufficiency of the complaint." *Randle v. AmeriCash Loans, LLC*, 403 Ill. App. 3d 529, 533 (2010). In ruling on a 2-615 motion, the allegations in the pleadings are the only matters that the court is to consider. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 485 (1994).

¶ 20 In contrast, a motion brought pursuant to section 2-619 of the Code " 'admits the legal sufficiency of the complaint but asserts an affirmative defense or other matter that avoids or defeats the claim.' " *Becker*, 292 Ill. App. 3d at 122 (quoting *Brock v. Anderson Road Ass'n*, 287 Ill. App. 3d 16, 21 (1997)). It assumes that a cause of action has been stated. *Cwikla*, 345 Ill. App. 3d at 29. A section 2-619 motion "raises defects, defenses or other affirmative matter which appears on the face of the complaint or is established by external submissions which act to defeat the plaintiff's claim." *Neppl v. Murphy*, 316 Ill. App. 3d 581, 584 (2000). "[A] section 2-619 proceeding enables the court to dismiss the complaint after considering issues of law or easily proved issues of fact." *Id.* at 585. In ruling on a section 2-619 motion, the circuit court may consider the pleadings, depositions, and affidavits. *Doe v. Montessori School of Lake Forest*, 287 Ill. App. 3d 289, 296 (1997).

¶ 21 We consider the following issues on appeal: (a) One Stop's motion to dismiss this appeal based on Global's violation of the Illinois Supreme Court rules relative to briefing format and content; (b) whether Global adequately alleged the existence of an implied-in-fact contract; (c) the propriety of Global's measures of damage, including claims for lost future profits, reimbursement of attorney fees and costs paid to Broadridge, and for recovery of payments made to One Stop; and (d) One Stop's cross-appeal for recovery of fees under the settlement agreement.

¶ 22                                    A. Motion to Dismiss

¶ 23 One Stop argues that Global's appeal should be dismissed because Global's briefs violate the Illinois Supreme Court rules in a number of ways. The procedural rules governing appellate

7

briefs are not suggestions; they are mandatory. *Ammar v. Schiller, DuCanto & Fleck, LLP*, 2017 IL App (1st) 162931, ¶ 11. When a brief violates the Illinois Supreme Court rules, we have discretion to strike the brief and dismiss the appeal. *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 12. However, we also recognize that striking a brief is a harsh sanction and is only appropriate where the violations of procedural rules hinder our review. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 15. We agree that Global committed errors in its briefing; the question is what penalty, if any, ought to be imposed.

¶ 24        Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) requires in pertinent part that a brief "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Global violated this requirement, submitting a brief that contains argumentative characterizations of the trial judge's rulings. Further, Global fails to adequately cite specific pages of the record on appeal. These transgressions are relatively minor. Given that courts should, when it is reasonable, decide cases on their merits rather than on procedural errors, we will overlook these problems but admonish Global's counsel to not do it again.

¶ 25        The more glaring problem relative to Global's briefs is its repeated violations of Illinois Supreme Court Rule 23 (eff. Feb. 1, 2023) by citing unpublished orders. Indeed, Global improperly cites multiple pre-2021 appellate court unpublished orders in making its arguments. Worse, many of the citations do not reflect that they are unpublished and thus nonprecedential.

¶ 26        The pre-2021 version of Rule 23(e) mandated that unpublished orders were "not precedential and may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." Ill. S. Ct. R. 23(e) (eff. Apr. 1, 2018). Effective January 1, 2021, unpublished orders entered after that date could be cited as persuasive authority,

8

but the amended Rule 23 did not look backwards. Ill. S. Ct. R. 23(e) (eff. Jan. 1, 2021). Parties were still generally prohibited from citing pre-2021 Rule 23 orders. Unfortunately, Global violated Rule 23 and cited unpublished cases anyway.

¶ 27    We acknowledge that an on-point pre-2021 unpublished decision can seem like the siren's song. This is especially true when litigants can cite rulings from other jurisdictions as persuasive authority. Parties can cite Illinois trial court rulings for persuasive purposes without running afoul of the former Rule 23(e), but they cannot cite an unpublished appellate order affirming *that very same* trial ruling. Our courts have cited poetry (*Thompson v. Illinois Power Co.*, 237 Ill. App. 3d 273, 278 (1992)), Broadway musicals (see *People v. Burrett*, 216 Ill. App. 3d 185, 194 (1991)), Gilbert and Sullivan songs (see *Freed v. Young*, 21 Ill. App. 3d 64, 71 (1974)), Frank Sinatra standards (see *Smoot v. Knott*, 200 Ill. App. 3d 1082, 1088 (1990)), and Miracle Max quotes from the film *The Princess Bride* (see *People v. Jackson*, 2020 IL App (4th) 170036, ¶ 69). An appellate panel even rejected the argument that a trial judge's *Seinfeld*-based admonishment that a witness avoid being a "fast talker" constituted reversible error. *Lopez v. Northwestern Memorial Hospital*, 375 Ill. App. 3d 637, 653 (2007). Thus, pre-2021 Rule 23 places Illinois trial court rulings, appellate rulings from other jurisdictions, and even pop culture references, on a higher plane than pre-2021 unpublished Illinois Appellate Court rulings. But that does not mean that Global has the right to disregard rules that it does not like. While Global's briefing errors are not fatal, they are not without consequence. Even though Rule 23's plain language restricts parties, and not courts, from citing unpublished cases, we will not consider the improperly-cited cases upon which Global relies; those citations are stricken from Global's briefs. However, One Stop's motion to dismiss is denied.

¶ 28                              B. Implied-in-Fact Contract

¶ 29    We now turn to the propriety of the trial court's findings. The trial court found that Global sufficiently pled the existence of an implied-in-fact contract between Global and One Stop. One Stop argues this finding was erroneous, largely because the "contract" lacks terms relating to timing obligations. We agree with the trial court.

¶ 30    Generally, whether an implied-in-fact contract exists is a question of law, the determination of which is reviewed *de novo*. *BMO Harris Bank, N.A. v. Porter*, 2018 IL App (1st) 171308, ¶ 51. Its existence depends on the facts, circumstances, and expressions by the parties demonstrating intent to be bound. *Id.* An implied-in fact contract must contain all elements of an express contract; the only difference is that an implied contract is inferred from the facts and conduct of the parties, rather than from an oral or written agreement. *Id.* ¶ 52. Thus, to sufficiently plead an implied-in-fact contract, Global had to plead the essential elements of a contract, supplied by implication from the parties' conduct or actions. *Id.* In reviewing the amended complaint, we accept as true all well-pleaded facts and reasonable inferences but need not accept conclusions or inferences which are not supported by specific factual allegations. *Id.* ¶ 53.

¶ 31    Global has pled that through their "acts and conduct," One Stop and Global "entered into a valid and binding contract" under which One Stop was "obligated to prepare and deliver certain proxy statements to [USPS] within a reasonable amount of time of receipt." The amended complaint pleads that Global informed One Stop the Broadridge mailings were "time sensitive," that One Stop stated it "could handle the time sensitive material and fully track it in two to five days," and that the industry standard for preparation of "time sensitive" mailings is "within a two-to-five-day span." It further pleads that a test run by One Stop preparing Broadridge material was completed successfully.

10

¶ 32    The amended complaint further states that One Stop processed mailings for Global from 2019 to 2021 "in a timely manner, each particular job taking several days." It alleges One Stop began to do Broadridge work for Global in May 2020, and One Stop understood the "same agreement the parties had been operating under" for Global's other customers "applied to Broadridge [deliveries] as well." Most importantly, Global alleges that from May 2020 to December 2020, One Stop processed "over four hundred deliveries" of Broadridge materials, "comprising nearly two million pieces of mail."

¶ 33    We conclude that Global adequately alleged the existence of an implied-in-fact contract, including time-based obligations on preparation and delivery of mailed materials. We further conclude that Global pled objective actions demonstrating that the timing obligations were an essential part of the parties' dealings. See *Paper Source LLC v. Sugar Beets, Inc.*, 2025 IL App (1st) 231878, ¶ 24. One Stop generally performed work in accordance with these parameters from 2019 to 2021, and those jobs were all completed within "several days."

¶ 34    We reject One Stop's arguments regarding time sensitivity not being a material part of the agreement. By the time Global's work for Broadridge began, their course of dealing spanned hundreds of mailings successfully completed within a few days. Taking all inferences in Global's favor, as we must, we agree that Global adequately alleged the existence of an implied-in-fact contract. We further agree that Global adequately pled that the December 2020 mailing was untimely and constituted a breach.

¶ 35                                    C. Damages

¶ 36    The circuit court dismissed the amended complaint with prejudice on section 2-615 grounds, finding that Global failed to adequately allege damages. 735 ILCS 5/2-615 (West 2022). Global claims three measures of damages: (1) lost profits from future transactions with

11

Broadridge, (2) reimbursement of fees and costs paid to Broadridge for its reimbursement of its client's fees and costs, and (3) recovery of payment made to One Stop for the breaching work as part of a settlement agreement of a separate lawsuit. We disagree, in part, with the circuit court.

¶ 37                                                        1. Lost Profits

¶ 38         The amended complaint alleges damages in the amount of "millions of dollars in lost profits resulting from the end of certain aspects of Broadridge's business relationship" with Global. It further alleges that the failure to timely prepare and deliver the Broadridge proxy statements, and the reimbursement costs Broadridge paid to its client, caused Broadridge to no longer use Global for certain kinds of mailings.

¶ 39         Lost profits may be recovered as damages for a breach. However, to recover lost profits, the loss must be proved with reasonable, although not absolute, certainty. See *Milex Products, Inc. v. Alra Laboratories, Inc.*, 237 Ill. App. 3d 177, 190 (1992); see also *Royal's Reconditioning Corp. v. Royal*, 293 Ill. App. 3d 1019, 1023 (1997). However, when the lost profits would have arisen only out of a collateral transaction, the party seeking them must not only establish them with reasonable certainty, but must also show that they were reasonably contemplated by the parties. See *Milex*, 237 Ill. App. 3d at 191.

¶ 40         The amended complaint does not contain sufficient allegations of lost profits as damages sufficient to survive a section 2-615 motion to dismiss. First, Global does not adequately allege the lost profits resulted from this specific Broadridge mailing transaction. Global's claim appears to rely on a series of unsupported inferences for the notion that Broadridge would have a certain level of continuing work, that it would use Global, and that Global would maintain a certain profit level. Second, future lost profits were not adequately contemplated by the parties. Indeed, Global does not allege any direct or specific communication to One Stop informing them that Global's

12

ongoing relationship with Broadridge, or profits on unrelated future deliveries for Broadridge, were dependent upon the successful completion of this specific Broadridge transaction. Third, Global makes inadequate allegations about its past and future relationship with Broadridge to support with any reasonable certainty its claim to any amount of lost profits from unrelated future transactions. While One Stop clearly had notice that Global's business dealings with Broadridge were time sensitive, Global fails to adequately allege a breach would change its relationship with Broadridge and that it would lose millions in business profits from future transactions. Fourth, Global fails to allege with reasonable certainty the monetary extent of the damages. Rather, it simply alleges there will be "millions of dollars in lost profits resulting from the end of certain aspects of Broadridge's business relationship." This claim is speculative, absent any pleading to support the purported lost profits amount with reasonable certainty.

¶ 41 The circuit court properly dismissed Global's claim for lost profits. However, we do not agree that the lost profits claim should have been dismissed with prejudice. We direct the circuit court to give Global an opportunity to replead on this issue.

¶ 42 2. Attorney Fees and Costs

¶ 43 Global's amended complaint seeks as damages "approximately $600,000 in costs for which it was forced to reimburse its long-term customer" Broadridge. Specifically, Global alleges that because One Stop did not timely process the Broadridge proxy statements for its client Devon Energy, Devon Energy was forced to file a Delaware chancery court suit. Global alleges Devon Energy expended approximately $600,000 in attorney fees and costs in the Delaware chancery suit and "demanded" that Broadridge reimburse it for those fees and costs, which Broadridge did. Broadridge in turn "demanded reimbursement" from Global for Devon's attorney fees and costs,

13

which Global likewise did. The trial court dismissed that claim for damages with prejudice, holding that such attorney fees and costs were not recoverable.

¶ 44    Generally, under the American rule, attorney fees and litigation costs are not recoverable absent a statute, contract, or stipulation. *Ritter v. Ritter*, 381 Ill. 549, 553 (1943). However, the American rule sometimes does not apply when a plaintiff sustains "losses directly caused by the defendant's conduct simply because those losses happen to take the form of attorneys' fees." *Sorenson v. Fio Rito*, 90 Ill. App. 3d 368, 372 (1980). Indeed,

> "where the wrongful acts of a defendant involve the plaintiff in litigation with third parties or place him in such relation with others as to make it necessary to incur expense to protect his interest, the plaintiff can then recover damages against such wrongdoer, measured by the reasonable expenses of such litigation, including attorney fees." *Ritter*, 381 Ill. at 554.

In other words, "one who commits an illegal or wrongful act is liable for all of the ordinary and natural consequences of his act," and that might include attorney fees. See *Sorenson*, 90 Ill. App. 3d at 371. That exception is sometimes referred to as the "third-party suit" exception.

¶ 45    One Stop argues that the third-party suit exception does not apply here because two required elements are absent. One Stop contends that the exception applies only where "(1) the party seeking fees was forced to preserve property rights in real estate due to the wrongful acts of another, which caused litigation expenses against a third party; and (2) the conduct complained of was 'wilful, wanton, malicious, oppressive, or at least as being of an active tortious nature.' " *Bartsch v. Gordon N. Plumb, Inc.*, 138 Ill. App. 3d 188, 205 (1985) (quoting *Insurance Co. of North America v. J.L. Hubbard Co.*, 23 Ill. App. 3d 254, 262 (1974)).

¶ 46    In *Bartsch*, the court wrote that the real estate requirement was recognized in *J.L. Hubbard Co. Id.* Our reading of *J.L. Hubbard* leads us to conclude, however, that *Bartsch* slightly overstated

14

that ruling relative to the first requirement. While *J.L Hubbard* distinguished the cases applying the third-party suit exception as having occurred in the context of litigants preserving their property rights in real estate, it never *identified a reason why* that should be a relevant distinction. Moreover, we cannot discern one.

¶ 47    More importantly, since the recognition of the third-party exception, Illinois courts have applied it in many contexts that did not involve preserving land rights. One Stop even acknowledges that "cases have strayed from this requirement." For example, Illinois courts have permitted plaintiffs to recover legal fees spent settling with an insurance company when the defendant wrongfully caused the company to cancel the plaintiff's policy (*Duignan v. Lincoln Towers Insurance Agency, Inc.*, 282 Ill. App. 3d 262 (1996)), obtaining refunds of tax penalties assessed on the plaintiff due to the defendant's negligence (*Sorenson*, 90 Ill. App. 3d 368), and filing a second divorce petition after the defendant's legal malpractice resulted in the dismissal of the plaintiff's first petition (*Nettleton v. Stogsdill*, 387 Ill. App. 3d 743 (2008)). We see no reason to limit the third-party suit exception to cases involving interests in real estate.

¶ 48    The second requirement that One Stop identifies for application of the third-party suit exception is, however, a problem for Global. Again, *Bartsch* and its progeny require that the conduct be "wilful, wanton, malicious, oppressive, or at least as being of an active tortious nature." (Internal quotation marks omitted.) *Bartsch*, 138 Ill. App. 3d at 205. While this requirement is admittedly a bit open-ended, one thing seems fairly clear. That is that the cases applying the third-party suit exception generally involve wrongful conduct in connection with malpractice or some wrongful conduct in *tort*, rather than a mere breach of contract. Given that parties may contractually elect to allocate, or not allocate, risk, a breach of contract is different than a tort for purposes of applying the third-party suit exception. Other jurisdictions have even referred to the

15

third-party suit exception as the "tort of another" doctrine or the "third-party tort exception." See, *e.g.*, *Hawkinson v. Bennett*, 962 P.2d 445, 456 (Kan. 1998); *Collins v. First Financial Services, Inc.*, 815 P.2d 411, 413 (Ariz. Ct. App. 1991); *Cypress Home Care, Inc. v. Qlarant Integrity Solutions, LLC, No. 5*, No. 5:19-CV-00042, 2020 WL 10317439, at \*7 n.4 (E.D. Tex. Mar. 18, 2020); *Sooy v. Peter*, 270 Cal. Rptr. 151, 153-54 (Cal. Ct. App. 1990). We see no reason to extend the caselaw here to claims involving a straightforward breach of contract.

¶ 49 Finally, we agree with the trial judge's conclusion that the $600,000 in attorney fees connected with Global's payment to Broadridge is just too remote to fall under the third-party suit exception. A central tenet of the exception is to make a party whole for damages that are a "natural and proximate consequence[ ] of a wrongful act." *Ritter*, 381 Ill. at 554-55. When Global reimbursed fees to someone else, who in turn incurred obligations to someone else, this chain of reimbursement obligations introduces too much attenuation to qualify as a natural and proximate consequence.

¶ 50 We conclude that the third-party suit exception does not apply because the claimed losses represent contractual dealings rather than a wrongful tort and because the damages sought were not a natural and proximate cause of a wrongful act. Accordingly, the trial court properly rejected this damage claim. We see no basis to conclude that repleading would cure the deficiency in Global's claim for attorney fees paid to a third party.

¶ 51 3. Unearned Fees, the Settlement Agreement, and the Voluntary Payment Doctrine

¶ 52 In its claim for relief, the amended complaint cites yet a third category of damages, seeking $78,508.78 in "unearned fees [Global] paid to [One Stop] for its admittedly defective work." Specifically, Global seeks to recover the fees it paid to One Stop for the mailing that was processed substantially late. These fees were paid as part of the settlement agreement.

16

¶ 53     One Stop argues that the voluntary payment doctrine bars recovery of the payment made pursuant to the settlement agreement. The common law voluntary payment doctrine embodies the " 'universally recognized rule that money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered back on the ground that the claim was illegal.' " *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶ 22 (quoting *Illinois Glass Co. v. Chicago Telephone Co.*, 234 Ill. 535, 541 (1908)). Courts have interpreted what constitutes a "voluntary" payment in a variety of ways since the recognition of the doctrine in Illinois. See *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 848-850 (1995) (discussing cases interpreting voluntariness of payments and exceptions to the doctrine); *Illinois Glass*, 234 Ill. at 542-44 (collecting cases illustrating varied applications of the doctrine).

¶ 54     The trial court agreed with One Stop and dismissed that damage claim with prejudice, finding that "the language in the settlement agreement does not give [Global] a reservation of rights to withdraw their payments pursuant to the settlement agreement or recoup them. The settlement agreement only allows other litigation to proceed and does not preclude [Global] from seeking other relief not contemplated for in the settlement agreement." We do not agree with the trial court.

¶ 55     The settlement agreement states, in relevant part:

"2. Voluntary Discontinuance of the Litigation Without Prejudice. Within seven (7) days of Plaintiff's receipt of the Settlement Amount in good funds and in full, the parties shall stipulate the dismissal of the Litigation, without prejudice, with each party to bear its own costs, fees (including attorneys' fees), and expenses. In the event of any subsequent litigation, after the Effective Date, between the Parties, the Parties reserve all claims,

17

including but not limited to, those brought in the Litigation, but Defendant will be credited for the Settlement Amount in full against any such One Stop claims."

¶ 56 The settlement agreement also contemplated future litigation between One Stop and Global, stating:

"3. Future Litigation. Any subsequent controversy, claim, action, suit, proceeding, or dispute arising out of, or relating to, the subject matter of the Litigation, including, but not limited to the 'Credit Application,' the 'Agreement,' the 'Services,' and/or the 'Invoices' as those terms are defined in One Stop's Verified Complaint in the Litigation, or otherwise by and between the Parties, whether initiated by Plaintiff or Defendant, shall be commenced in the state or federal courts located in the State of Illinois, and each Party hereby irrevocably consents to the personal jurisdiction of said courts in any such controversy, claim, action, suit, proceeding, or dispute and will not seek to transfer any suit from any state or federal court located in the State of Illinois out of the State of Illinois."

¶ 57 The unambiguous language of the settlement agreement states that in "any subsequent litigation," "the Parties reserve all claims," which necessarily includes those claims brought in the "settled" Du Page County circuit court case No. 2021-L-1352. The plain meaning of the words used in the settlement agreement shows that the parties both contemplated and agreed that claims related to the invoiced work could be revived. Indeed, the clear intent of the parties was that subsequent litigation could include the resolution of any issues raised about the invoiced work, including whether the work breached an agreement between them, and whether payment for the work was "unearned" and, thus, subject to return. The trial court erred by interpreting the settlement agreement to impose limitations on the reservation of rights that were not expressed in its language.

18

¶ 58     The trial court also erred in interpreting the settlement agreement as reserving for Global the limited right to only seek "other relief not contemplated for in the settlement agreement," thus barring Global from seeking to "recoup" any part of the settlement payment. The unambiguous language of the settlement agreement states that both parties "reserve all claims, including but not limited to, those brought in the Litigation." The phrase "all claims" does not limit in any way the relief that Global may seek, and no language specifies what relief was "contemplated by the settlement agreement" that might be barred in any future litigation. No language in the settlement agreement prevents Global from pursuing its contract claim of restitution or from seeking to "recoup" a portion of the settlement payment.

¶ 59     The parties' intent to allow for subsequent litigation to resolve claims about invoiced payments that might be part of the settlement payment is also evidenced by other language in that agreement. That language unambiguously states that the dismissal of the One Stop lawsuit would be "without prejudice." Thus, both parties agreed that the dismissal allowed all issues of payment for the invoiced work to be raised again in another suit by either party. A dismissal without prejudice means the court entered no final decision on the merits of any claim and that no party is barred from refiling the same action. *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, ¶ 24.

¶ 60     Moreover, the agreement lacks a release of either One Stop or Global from any claims brought by the other, including a claim for the payment of any invoiced amounts. Illinois has recognized a release as an agreement under which a party relinquishes a claim against another party. *Hagene v. Derek Polling Construction*, 388 Ill. App. 3d 380, 382 (2009). If One Stop had intended the settlement agreement to extinguish all claims related to invoices covered by the settlement payment, it could have had Global release any such claims in the settlement agreement, but it did not.

19

¶ 61　　　　One Stop argues that allowing recovery of any portion of the settlement payment would nullify setoff language crediting Global's settlement payment against any required subsequent litigation payment. One Stop is wrong. We will not interpret contract language in a way that nullifies a portion of the contract or is contrary to the plain meaning of the words used. *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011). The settlement agreement allows Global to be credited for the settlement payment "against any such One Stop claims" in subsequent litigation. Accordingly, the setoff language One Stop cites is only implicated if subsequent litigation determines that One Stop is owed more money than the settlement payment already made by Global. That language does not apply at all if it is determined that Global should be returned some portion of the monies represented by the settlement payment. The setoff provision is not nullified if Global ultimately proves that a portion of the payment paid for work that resulted in the breach of contract and should, therefore, be returned.

¶ 62　　　　The principles underlying the voluntary payment doctrine also inform our analysis of whether the doctrine will apply to bar Global's recovery of any monies paid under the settlement agreement. The two primary rationales asserted to justify use of the doctrine are that it allows the receiving party to rely on the receipt of the funds for future use and forces the payor to contest the payment when it is made so that the payee may react and address the concern at or before the time of payment. See *Putnam v. Time Warner Cable of Southeastern Wisconsin, Ltd. Partnership*, 2002 WI 108, ¶ 16, 255 Wis. 2d 447, 649 N.W.2d 626. Interpreting Illinois case law on the doctrine, the Seventh Circuit Court of Appeals noted that the doctrine ensures "that those who desire to assert a legal right do so at the first possible opportunity; this way, all interested parties are aware of that position and have the opportunity to tailor their own conduct accordingly." *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 668 (7th Cir. 2001). We conclude that Global expressly

20

reserved its legal rights in the settlement agreement and that the parties expressly contemplated that those rights could still be litigated.

¶ 63    Because the terms of the settlement agreement and the voluntary payment doctrine do not bar Global's subsequent restitution claim, we reverse the trial court's dismissal with prejudice of Global's claim seeking the return of the payments it made to One Stop for the breaching work as part of the settlement payment. Because Global pled at least one form of cognizable damages, we also reverse the dismissal of its amended complaint and remand the cause for further proceedings consistent with this order.

¶ 64                              D. Fee Shifting Under the Settlement Agreement

¶ 65    Finally, we turn to One Stop's cross-appeal, asserting that the trial court erred in denying its petition to recovery attorney fees and costs due to its misreading of the fee-shifting provision in the settlement agreement. The trial court's consideration of both One Stop's fee petition under that fee-shifting provision and its request for costs was premised on the case being fully resolved and dismissed. Because we reverse the dismissal of Global's amended complaint and remand for further proceedings, we must vacate the trial court's ruling on the fee-shifting issue as not yet ripe for determination. We make no determination on the propriety of fees under the settlement agreement's fee-shifting provisions.

¶ 66                                           III. CONCLUSION

¶ 67    For the reasons stated, the judgment of the circuit court of Du Page County is affirmed in part and reversed in part and the cause remanded for further proceedings consistent with this opinion.

¶ 68    Affirmed in part and reversed in part; cause remanded.

21

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 23-LA-0568; the Hon. Angelo J. Kappas, Judge, presiding. |
| **Attorneys for Appellant:** | Blair R. Zanzig, of Leibowitz Hiltz & Zanzig LLC, of Chicago, and Paul F. Millus (*pro hac vice*) and Daniel B. Rinaldi (*pro hac vice*), of Meyer, Suozzi, English & Klein, P.C., of Garden City, New York, for appellant. |
| **Attorneys for Appellee:** | Robert H. Lang, Patrick Morales-Doyle, and Caroline Pritikin, of Thompson Coburn LLP, of Chicago, for appellee. |